Alright, our third case for today is United States v. Betts. Two docket numbers, 21-2572 and 21-3157. Mr. Drysdale. Thank you, Your Honor. May it please the Court. Tom Drysdale on behalf of the defendant, Shamar Betts. Mr. Betts pled guilty to violating 18 United States Code Section 2101, better known as the Anti-Riot Act, based on a post made to the social media website Facebook. And also some follow-ups, right? Like the flyer saying, show up at 3 with your bricks? That was the post made to Facebook, Your Honor. So the crux of this offense is the post made to Facebook that violated the Anti-Riot Act. And just to be clear, his guilty plea doesn't specify which subsection of Part A he's pleading to. He's just generically pleaded to all of Part A? That is also correct, Your Honor, yes. And the two main issues before the Court today, first is a constitutional issue on whether the statute is facially overbroad in violation of the First Amendment, and whether the district court abused its discretion in choosing a scope of restitution that is geographically arbitrary and not explained through adequate causation. So looking to the constitutional issue, this statute requires two overt acts. The first is travel or use of interstate commerce with a specific intent that is outlined in the statute 1, 2, 3, and 4. And by the plain language of the statute, any other overt act is the second overt act. Now, this Court has come to a different conclusion 50 years ago in Dellinger. What this Court decided was that second any other overt act is one of the four acts that is outlined in 1, 2, 3, and 4. With respect to this Court 50 years ago, we believe that conclusion is incorrect. It is not true to the plain language of the statute. Counsel, can you clarify for me? I read your brief very carefully, and I read Dellinger very carefully. Is there any argument you raised with regard to the constitutional issue that was not raised in Dellinger? Your Honor, I'm not necessarily sure that our arguments are any different. What I think is different is the landscape that has went on for the last 50 years, some decisions by the Supreme Court. Because this Court in Dellinger said this whole statute is perfectly fine without any problems whatsoever. That has been significantly eroded by both Supreme Court precedent and two other circuit courts who have said there are substantial problems with this statute. Now, the Ninth Circuit did agree with this Court in Dellinger on the overt act portion of the statute. But again, we don't believe that is true to the plain language of the statute. When we look at the overt act provision, it says any other overt act. Overt act has a settled meaning. We look to the conspiracy statute, and the conspiracy statute just says it's any act. And this act is also modeled after the Travel Act. And if this Court looks to the Travel Act, which is section 1952, we see the structure in the Travel Act that Dellinger tried to apply to this statute. Congress knows how to write that structure. It says the second overt act in the Travel Act is 1, 2, 3, and 4. That's written in the Travel Act. That is not what Congress wrote in the Anti-Riot Act. They chose different language. Even if we were willing to either pare back or in other ways modify Dellinger, why isn't the approach that the Ninth Circuit took in the Rondeau case, one which is sensitive both to the expressive dimensions of words like organize or promote or urge and things of that sort, but also sensitive to the Supreme Court's instruction that we should try to sever the problematic parts of things. And doesn't that leave Mr. Betz right where he started? Well, Your Honor, I would say that severance in the sense that the Ninth Circuit undertook it would leave Mr. Betz right where he started. The problem goes back to what Your Honor said with severance and what the Supreme Court has said about severance. And this is particularly in the Alaska Airlines case. The Supreme Court said that the question is not whether severance leaves a statute that functions. Because admittedly the Ninth Circuit left a statute that functions. It certainly did. I agree. The question is whether severance leaves a statute that functions in the manner that Congress intended it to function. Those are not the same question. And we can look at what Congress wrote here and see how Congress meant this statute to function pre-Brandenburg because this statute was pre-Brandenburg. Although Dellinger, of course, comes out well after Brandenburg. Correct. And there's no severance discussion in Dellinger because this Court said that the whole statute is fine. But we can look to the double negative clause in particular where Congress clearly intended to punish speech that was the mere advocacy of acts of violence. But, of course, Rondo severs that part. Right. Absolutely. But the problem with that is that's what Congress was trying to punish is speech and expressive conduct that far precedes a riot. But why can't we look at this, though? It certainly also intended to punish any act of violence in furtherance of a riot. That's three, you know, just for example. Correct. So the question then becomes is Congress only, when Congress passed this statute, were they just trying to punish vandalism and assaults? No, it's not a question of how broad their intent was. It's a question of whether they would have been willing to take half a loaf. Correct, Your Honor. If they had anticipated Brandenburg. That is absolutely correct. And our position is they wouldn't. They were trying to capture speech that far preceded riots. They wanted a much wider net. And they can't have it. Yes. And you also talked about functionality. In a severance statute, what doesn't function there? Oh, it functions. I would agree that it functions, Your Honor. Our argument would be that it doesn't function in the way Congress wanted it to. No, it doesn't punish speech. But it does certainly punish other things Congress was trying to punish in the Anti-Riot Act, such as the Part 3, just to take the easiest one. And to take Judge Hamilton, given the choice between no statute at all and a statute that addresses these acts of violence, what evidence is there that Congress would have preferred nothing? Well, Your Honor, we looked at the legislative history and the statements that were made when this act was being passed, such as we're trying to capture people who come in from out of state, and they make these types of speeches, and then they leave. And so that is certainly within the net they're trying to cast. And maybe, maybe that this severed down statute is something that Congress might have preferred. But the proper solution is to go back and let Congress decide whether that's what they want. Well, so the way I read Dellinger, Mr. Drysdale, we and the Ninth and Fourth Circuits sort of all wind up in pretty much the same place. I would agree. Importing imminence, the Brandenburg concept of imminence, whether by saving construction or severance or whatever, obviously there's some nuances that in a real trial a judge would have to sort out with jury instructions. But I'm trying to be sensitive to the danger that you're focusing on about chilling speech. Correct. And my problem is that at least since Dellinger, I don't see a whole lot of chilling of speech as a result of the anti-riot act in the last 50 years. Well, Your Honor, I guess we can't see what's chilled and what isn't. But what we do see is people— Well, take a look at the morning of January 6th, 2021 on the Ellipse. Certainly. I didn't see speech being chilled there. Right. But what we do see is multiple prosecutions across this country under the anti-riot act for speech that doesn't have an imminence requirement. Particularly, there was a case in Ohio where someone made a post to Facebook and set a date and was arrested, I think, three to four days before the date. And so the problem is we are seeing prosecutions that don't meet Brandenburg's imminence requirements. So our solution would be for Congress to try again. Assuming that this— What happened? What happened with the Ohio case? I believe it's still not settled, Your Honor, to the best of my knowledge. Go ahead. Can I ask you to turn—I know we're kind of jumping ahead a little bit to the restitution part of your argument. Yes. Because of all the things you've raised, that concerns me perhaps the most. He gets this $1.6 million. I guess every last bit of damage that ensued from the riots is now put at Mr. Betz's foot. And there are two things you argue. One, that he was under a different understanding of what the geographic scope of the area affected by the rioting was going to be. Correct. And I think you're also making the argument, maybe a kind of approximate cause argument, that how do we tie all of this to him? That's right, Your Honor. We have multiple arguments here. One, that the MVRA doesn't apply to begin with because this is not an offense against property under the MVRA. But we do also have an argument that the scope that the district court chose is completely arbitrary. It's the second scope that the district court chose. It tried two different times and still has not settled on a scope yet that makes any geographical sense. And the reason for that is the government didn't produce any evidence of causation. They just guessed. The government just said there was a Facebook post and some damage happened. Ergo, Shamar Betz is responsible for every bit of that. So what evidence are you looking for? That there were stores that Mr. Betz either was or was not in or that he shouldn't be held responsible for the actions of all the people who showed up? That's correct. We know which store Shamar Betz were in. And we would concede that the government proved causation as to where he went and what he did. Was that Old Navy was one of them? Old Navy and Macy's, I believe, were the two. The evidence I'm looking for is the evidence the government admitted at sentencing. Twenty-eight individuals were charged in state court in connection with this riot, and the government didn't do the work to bring a single one of them in to say, Why were you there? Did you see the Facebook post? And that's the evidence I'm looking for, evidence readily available to the government to prove that this damage can be connected up to Shamar Betz. So let me ask you about this. Suppose somebody, you know, Smith reads Shamar Betz's Facebook post and says, What a good idea. I'm going to go join this. And then Smith calls up Jones and says, Hey, we're all going to go have a riot or whatever they say. So is Betz also responsible for Jones? In other words, there might have been a lot of word of mouth spreading of this. There was. This post on Facebook was shared over 700 times. I don't think Betz is responsible for all of that. That's Smith's problem. And that is the whole reason the complexity exception should have applied. Okay. In this case, is because the government, the district court, nobody knows where this starts, where this ends. Mr. Drysdale, I understand that point. What I have trouble understanding is why the complexity exception is something a defendant is entitled to invoke. That seems to me to be a very troubling incentive. Well, I think when we get under the Mandatory Victims Restitution Act, I think that once the government can't prove causation, that we ask the district court to say, Look, this is part of the statute and it's designed for it. That's a merits argument. Okay. That's different from saying, This is too complicated. You can't order me to pay restitution. Well, I think, and the problem here is the district court wouldn't even consider it. What I think happens under the complexity exception, or what I know happens is, we at least get to present arguments to the district judge because it becomes a balancing test at that point. And I would like to at least present those arguments to the district court because then, under that exception, the district court can determine whether or not Shamar Betz, who everybody admits in this case has no money, he's never going to pay this $1.6 million, the district court admitted it. He's not going to pay this. So then when we get under the complexity exception, the district court, by the law of this court, can take into account other remedies available to the defendant. And we all know that these defendants had property insurance and they were paid out this money. And so that can be part of the balancing test. And I want to be able to at least make that argument to the district court when we're talking about $1.6 million for a 19-year-old young black man whose life is ruined by this restitution order. I want to be able to make those arguments. And when the district court can't figure out any causation, that's why that exception is in there. And the district court just gave up. It said, I'm finished. I'm done with this when I tried to point out the holes in the scope of the restitution. And the court just can't draw a line because it can't figure out causation. That's why the complexity exception exists. That's why we should have been able to engage in that balancing test. And at this point, I'm— If you would like to save a little bit of time. I would, Your Honor. Thank you very much. You're welcome. Thank you. Yes, Mr. Handel. Good morning, Your Honors. May it please the Court, Josh Handel for the United States. In United States v. Dellinger, this Court considered and rejected First Amendment objections to the Anti-Riot Act that are identical to the facial constitutional challenge Mr. Betz asserts here. Since that time, there has been no substantive statutory revision by Congress or intervening decision of this Court or of the Supreme Court that would deprive Dellinger of its binding effect in this circuit. But the Supreme Court has issued decisions over and over again, I would say, that underscore the importance of the First Amendment, that underscore that even highly offensive conduct, such as demonstrating at somebody's funeral or crushed videos or just all sorts of things are protected by the First Amendment. And so the fact that this Court did decide Dellinger not too long after Brandenburg was decided is a historic fact. And I'm not sure that we should just cling to Dellinger. What I'm interested in is your view about the Ninth Circuit's approach and, you know, the Rondo case or the other approaches. What harm would it be for the government if we were more sensitive to the Supreme Court's speech jurisprudence but used severance to pare this statute back to where perhaps it constitutionally can be? Sure. So a couple of responses on that, Judge Budd. I think I want to just put a pin in the fact that we don't agree that intervening decisions, intervening case law of the Supreme Court has unsettled the foundations of Dellinger at all. I understand that you've asked me to move on from that point, but I do just want to emphasize that Brandenburg remains the critical test under Supreme Court precedent. This case, as you mentioned, or this Court, as you mentioned, had the benefit of Brandenburg when it handed down Dellinger. But just to move on to your second question, you know, kind of what skin is it off our hide if we, you know, were to, if this Court were to adopt Rondo or the Fourth Circuit's decision in Miscellus, certainly with respect to this case, with respect to Mr. Betz's convictions, as I believe my friend on the other side acknowledged during his time at the lectern, it would make no difference whatsoever. This conviction would stand. So is the government really taking the position that, for example, with respect to the January 6th riots, if it came to light that somebody sent an email to Mark Meadows saying, let's storm the Capitol, and so you're going to prosecute that, urging the storming of the Capitol or advocating the storming of the Capitol? Well, prosecutorial decisions are very complex. I think that- I don't accept that answer, having spent some time in the Department of Justice. Judge Wood, I think in that hypothetical, a couple of things. So first of all, it's important to understand a little bit more about the circumstances there, whether those circumstances would, in this Court's wording in Dellinger, be likely to propel the violent action. And this is a 19-year-old kid who's been outraged, as very many people in the country were, by the murder of George Floyd, who, granted, doesn't react the right way, but what the government has decided to do is ruin the rest of his life, send him to prison, make him unable to get a decent job because he'll be an ex-felon, and then saddle him with $1.6 million in restitution, which he will never pay. He'll have to live outside the economy, of course, because he won't have any credit. Your Honor, I absolutely understand that there are tremendous and sometimes tragic human costs to every prosecution, every conviction. I don't know that we're here discussing some of the prosecutorial decisions that went into bringing this case. But we are, in a sense, talking about things like the rule of lenity, and have we properly both taken the First Amendment into account with this anti-riot act? Have we understood the scope of the act? And, in particular, with the restitution, has the government met its burden to show proximate cause for all of that damage? Maybe some is fine, but was the process one in which we can have confidence? Sure. And what I would say is, setting aside any concerns that the court may have about the fairness, judiciousness of undertaking this prosecution, in terms of the First Amendment, the application of the anti-riot act to this case is very evident. It's beyond question. Mr. Betz actually participated in a riot. He looted stores. He destroyed property. This is all admitted to. You agreed that your evidence shows just the two stores, though. You weren't just holding him responsible for Macy's and Old Navy. That's correct. So the evidence of what he actually personally took was, yeah, I think we adduced video evidence of Old Navy and Macy's, yes. And he just had a backpack, right? He really didn't have much. I believe that's correct, yes. If I recall correctly, it was 35 stores, right, that he was held accountable for. That he was ultimately held accountable for, that's correct. And those were in the mall that was the location. His post referred to the mall and two streets. That's right, Judge Hamilton. And I understood that there was some debate about, in essence, stores on the corner of the streets who had street addresses, which doesn't seem to me worth worrying about too much. But are there others, is there a fuzzier edge that's not covered by those, the scope, in essence, of his original post? So what I understood the dispute at sentencing to be, at least at the third of the sentencing hearings, was whether Prospect and Neal refers to just Prospect Street and Neal Street, or whether it refers to the commercial area that's around that intersection. And they're two parallel streets, right? So I looked at Google Maps this morning. I think that Prospect kind of bends around because you have the mall in there. So it's never quite as easy as that, Judge Hamilton. But I think that, yeah, so the dispute at sentencing was whether the district court was trying to encompass this commercial area or just those two discrete streets and businesses. If I were the district judge, I'd be trying to think how would the recipients of the Facebook post have interpreted it. Well, you know, I think that I believe the wording with respect to Prospect and Neal Street in the Facebook post was we're hitting the whole Prospect and Neal. So to me, I would understand that as the area, but, you know, this is also susceptible to perhaps local habits in terms of how things are referred to. I think I might have lost the thread of your question a little bit, Judge Hamilton. But to get back, Judge Wood, to some of your concerns, you know, I absolutely understand having some concerns about the exercise of prosecutorial discretion here. I think that, again, what we're in this court talking about is a facial challenge to this statute on First Amendment grounds. Right, which at least two other circuits, I mean, you would have to, at best, we have a conflict in the circuits if Dellinger says the whole thing is fine and with two other circuits thinking that some surgery is necessary but that there is a core that is acceptable. I agree that there's a shallow conflict there, Judge Wood. I would point out that, you know, this court has said many times, most recently I believe in United States v. Lehman, that the mere existence of a circuit split does not justify a panel overturning a prior panel's precedent, that it doesn't meet the compelling reason test. But getting back to something that I think Judge Hamilton asked my friend on the other side, you know, there's some question as to whether there's any meaningful daylight between the rule announced by Dellinger, the narrowing construction adopted by this court in Dellinger, and the severing and excision exercise undertaken by the Ninth Circuit in Rundeau and the Fourth Circuit in Miscellus. We would contend, and in fact we have contended in opposition to certiorari in the Supreme Court, that there is not any meaningful distinction between the rules adopted by those decisions. And that's because all of those cases hold consistent with Supreme Court precedent that abstract advocacy is not criminal, but incitement is. That's exactly what this court said in Dellinger when you said, or when you rejected the contention that the statute provides punishment for mere oral or written advocacy of an act of violence or assertion of the rightness of an act of violence. And it's exactly what the Fourth Circuit said in Miscellus when it adopted the principle that expression that is directed and likely to produce imminent lawlessness is subject to criminal liability, but mere or abstract advocacy is not. I recognize that the circuits have taken a somewhat different avenue there, but I don't think that there is any meaningful distinction in terms of the ambit of conduct subject to liability. I'm happy to address other questions about... Why should we not use elements to decide what are analogous guidelines or what are the most analogous guidelines? And perhaps, I'm wondering if we might not also face a similar shallow circuit split on methodology as to that question. Sure. So, Judge Hamilton, as we pointed out, I believe it's at pages 32 through 34 of our brief, there's a consensus view of other circuits that district courts engage in a two-step analysis when applying sentencing guidelines section 2X5.1. First, they do use an elements-based approach to determine whether there is any sufficiently analogous guideline. And second, they look to the actual offense conduct or what the guidelines commentary calls, quote, the type of criminal behavior, end quote, to determine the most analogous offense guideline. And that's exactly what we did here. We suggested to the district court that when you're talking about an offense under the Anti-Riot Act, which contemplates riots that either threaten or achieve physical injury to the person of another or damage to the property of another, that the appropriate guidelines, the appropriate analogs in the guidelines are either the personal assault guideline or the property damage guideline. And then we got to the second step and we said, based on the conduct here, based on what Mr. Betz was setting out to do, and based on what was actually achieved, the property damage guideline was the more analogous one. You know, the court said, I don't think it makes a difference very much whether we use this guideline or not. Is it your position that's the same as the court saying his sentence would have been the same without the guideline? Your Honor, obviously, we would have liked a little bit stronger statement. But I also think that, you know, this court has very recently expressed concern that district courts are starting to just kind of slap on inoculating statements at the end of sentencing. And, you know, some of those are the wording is much more watertight. But we think that here the district court's verbiage actually showed that the judge was engaging with the issue, that the court recognized what the guidelines dispute was and said in the course of resolving that dispute, you know, I'm not sure that it makes very much difference. It might not make any difference to the Court of Appeals. I think that's just how we generally speak as people. You know, this court said in United States v. Malone that judges do not always speak as clearly as they would write. And it would be wrong to interpret imperfection in oral expression to mean more than the context suggests. So certainly we would prefer to win this issue on just the fact that the district court did correctly apply USSG 2X5.1 with the elements-based approach first and then the conduct-based approach. But I think that we have a very robust harmlessness argument even as perhaps that window has narrowed a bit under Asbury and some of the court's more recent decisions. Unless the court has further questions, I'll rest on our brief and respectfully request that you affirm the judgment below. Thank you. Thank you. Anything further? Your Honor, the Supreme Court said in Williams that encouragement is an overbroad verb. And so the suggestion that there's been no intervening Supreme Court case law that would call Dellinger into question is simply wrong. And despite what the government has asked this court to do today, we don't leave overbroad statutes in place and hope the government uses them responsibly because they didn't here. They use an overbroad statute to ruin Mr. Betz's life for a case that could have been a state law case. And it was. Well, he was prosecuted, wasn't he? And it was. And there is no doubt that his conduct was not protected by the Constitution. I'm using my own double negative there to be confusing. Understood, Your Honor. But it is clear that his conduct is unprotected. That is clear. And it could have and was prosecuted at the state level. There is causation as to the two stores Shamar Betz went into. We don't disagree. But the government just told you that that's the only causation evidence they actually have in this case is the stores. They have Shamar Betz going into two stores on video. That's their causation evidence. That's where it should have ended because they can't prove anything beyond that. Unless there is some sort of vicarious liability, Mr. Betz being held responsible for the actions of everybody else who participated in the looting. And we still, at that point, need to know why they were there. And the government never did any of that. And quickly to the guidelines range issue, it is an elements-based approach. The district court said, on the record, property damage is not an element of this offense. The district court never should have used a property damage guideline. Okay. Thank you. There's nothing further. Thank you, Your Honor. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.